UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2019 JUL 19  PM 12: 57**

CLERK
BY_____
DEPUTY CLERK

SOM N. TIMSINA, BHAKTI R. ADHIKARI, and      )
CENTRAL MARKET WINOOSKI, LLC,                )
                                             )
        Plaintiffs,                          )
                                             )
    v.                                       )        Case No. 2:17-cv-00126
                                             )
UNITED STATES OF AMERICA,                    )
                                             )
        Defendant.                           )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO STRIKE AND GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

(Docs. 10 & 57)

Plaintiffs Som N. Timsina, Bhakti R. Adhikari, and Central Market Winooski,

LLC ("Central Market") (collectively, "Plaintiffs") bring this action pursuant to 7 U.S.C.

§ 2023(a)(13) and 7 C.F.R. § 279.7 seeking judicial review of the June 7, 2017 decision

by the United States Department of Agriculture (the "Agency") permanently

disqualifying Central Market from participation in the Supplemental Nutrition Assistance

Program ("SNAP"). Plaintiffs contend that the Agency and its subsidiary department, the

Food and Nutrition Service ("FNS"), improperly relied on computational analysis to

determine that Plaintiffs engaged in SNAP benefits trafficking at Central Market.

Pending before the court is Defendant United States of America's November 9,

2017 motion for summary judgment. (Doc. 10.) On January 12, 2018, Plaintiffs filed an

opposition and requested additional discovery pursuant to Fed. R. Civ. P. 56(d).

Defendant replied on March 14, 2018 and opposed Plaintiffs' Rule 56 discovery request.

At a hearing held on May 8, 2018, the court deferred consideration of the motion for

summary judgment and instructed Plaintiffs to identify the information that they sought

in discovery. On September 10, 2018, the court permitted the parties ninety days to

conduct limited discovery and granted the parties permission to file supplemental briefing

on the motion for summary judgment. On December 4, 2018, Plaintiffs filed a supplemental response to the motion for summary judgment. On March 1, 2019, the court took Defendant's motion for summary judgment under advisement.

Also pending before the court is Defendant's motion to strike Plaintiffs' statements of undisputed material facts. (Doc. 57.) On March 11, 2019, Plaintiffs opposed the motion. Defendant replied on March 14, 2019, at which time the court took Defendant's motion to strike under advisement.

Plaintiffs are represented by Andrew Z. Tapp, Esq. and Kevin A. Lumpkin, Esq. Defendant is represented by Assistant United States Attorney Melissa A. D. Ranaldo.

## I.    Defendant's Motion to Strike.

Defendant moves to strike Plaintiffs' statement of undisputed material facts because it fails to comply with the court's Local Rules and sets forth facts that are disputed. There is no provision in the Federal Rules or this court's Local Rules allowing a party *opposing* summary judgment to file its own statement of *undisputed* facts. *See Schroeder v. Makita Corp.*, 2006 WL 335680, at *4 (D. Vt. Feb. 13, 2006) (ruling that "there is no need for [the party opposing summary judgment] to establish undisputed facts at this stage of the litigation"). Instead, the Local Rules require a party opposing summary judgment to submit "a separate, concise statement of *disputed* material facts." L.R. 56(b) (emphasis supplied). The motion to strike Plaintiffs' statement of undisputed facts is therefore GRANTED IN PART. The court will consider Plaintiffs' factual submissions provided they are material, supported by admissible evidence, and undisputed. *See Boule v. Pike Indus., Inc.*, 2013 WL 711937, at *2 (D. Vt. Feb. 27, 2013); *Post v. Killington, Ltd.*, 2010 WL 3323659, at *1 n.1 (D. Vt. May 17, 2010).

Defendant also moves to strike Plaintiffs' supplemental response to Defendant's statement of undisputed material facts on the grounds that it fails to comply with the court's Local Rules. As Defendant points out, Plaintiffs were previously advised of the necessity of filing a separate, concise statement of disputed facts and were granted ample time with which to do so. Defendant asserts that although Plaintiffs' response "largely admits that the material facts are undisputed," it qualifies many of the statements with

2

"lengthy discussions of Plaintiffs' interpretation of the facts, including assumptions, conclusions, and arguments." (Doc. 57 at 4-5.) To the extent Plaintiffs' responses to Defendant's statement of undisputed material facts are more properly characterized as legal arguments, they will be disregarded because a legal argument cannot create a disputed fact under Fed. R. Civ. P. 56. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). In addition, the court will not search Plaintiffs' briefs for facts that are unsupported by record references. *See MacLeod v. Town of Brattleboro*, 2012 WL 1928656, at *1 (D. Vt. May 25, 2012) ("[T]he court does not consider [p]laintiff's challenges to facts that are not supported by references to the evidentiary record."). The Federal Rules of Civil Procedure provide as follows:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). To the extent Plaintiffs have failed to comply with this mandate, their supplemental response is stricken. To the extent Plaintiffs' supplemental response is supported by admissible evidence and record references, it will be considered. Defendant's motion to strike Plaintiffs' supplemental response is thus GRANTED IN PART and DENIED IN PART.

## II. Plaintiffs' Request for Additional Discovery.

In their supplemental response, Plaintiffs request additional discovery pursuant to Fed. R. Civ. P. 56(d), contending that it has the potential to create a genuine issue of material fact. Specifically, Plaintiffs claim they need to take the depositions of FNS agency officials and probe the investigative protocol for potential SNAP violations. "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present

3

facts essential to justify its opposition," the court may deny or defer the pending motion for summary judgment, permit time for additional discovery, or issue another appropriate order. Fed. R. Civ. P. 56(d).

At a hearing held on May 8, 2018 regarding Plaintiffs' prior Rule 56(d) request, the court granted Plaintiffs' request for discovery prior to responding to Defendant's motion for summary judgment, but declined to permit Plaintiffs to conduct discovery to challenge the accuracy and validity of the Anti-Fraud Locator using Electronic Retailer Transactions ("ALERT") system, concluding that a challenge to the SNAP enforcement system was outside the scope of Plaintiffs' Complaint which challenged Plaintiffs' disqualification as an approved SNAP retailer. Commencing on September 10, 2018, Plaintiffs engaged in discovery over a ninety-day period. Thereafter, Plaintiffs obtained written discovery related to Defendant's investigation, methods, policies, and procedures. Plaintiffs did not take any depositions of customers and instead procured supplemental affidavits from the same five customers who provided affidavits in the administrative process. Thereafter, Plaintiffs were afforded well over a year to respond to Defendant's November 9, 2017 motion for summary judgment.

In their supplemental response, Plaintiffs contend that discovery has been "severely handicapped" because they have not been permitted to depose Agency officials and employees who conducted the data analysis pertaining to this case. (Doc. 48 at 24.) They contend that cross-examination of Agency officials rather than consulting their own records would enable them to prevail in this case. To support their request, Plaintiffs cite *Sue Tha Lei Paw v. United States*, 2018 WL 1536736, at *4 (S.D. Cal. Mar. 29, 2018) and *Rodriguez Grocery & Deli v. U.S., Dep't of Agric. Food & Nutrition Serv.*, 2011 WL 1838290, at *5 (D. Md. May 12, 2011), two cases in which summary judgment was denied in order to allow retailers to conduct discovery. However, in those cases, the plaintiffs sought data matching the retailers' customers to the suspect transactions—data which the Plaintiffs in this case have obtained. *See AJS Petroleum, Inc. v. United States*, 2012 WL 683538, at *5 (D. Md. Mar. 1, 2012) ("Because additional discovery would not

4

change the factual landscape in this case, an analysis under the summary judgment standard is appropriate.").

The crux of this case is not whether the ALERT system is a reliable investigative tool but whether Plaintiffs can demonstrate by a preponderance of the evidence that they did not engage in trafficking of SNAP benefits as charged and determined by the Agency. None of the additional discovery sought by Plaintiffs will aid them in sustaining this burden. The testimony of Agency officials and employees who analyzed Plaintiffs' data is simply not relevant to whether Plaintiffs trafficked in EBT benefits because noncompliance or unreliable investigative methods by Agency representatives would neither fulfill nor excuse Plaintiffs' burden of proof. *Tikabo v. United States*, 2017 WL 5075275, at *7 (S.D. Tex. Aug. 21, 2017) (denying plaintiffs' request for additional discovery upon finding that they "appear to be utilizing these broad discovery requests to distract the court from their burden of disproving the trafficking violations"); *Oliver v. New York State Police*, 2019 WL 1324040, at *4 (N.D.N.Y. Mar. 22, 2019) ("The party seeking the discovery must make a prima facie showing that the discovery sought is more than merely a fishing expedition.") (citation omitted).

Because Plaintiffs have had ample opportunity to discover information that could potentially create a genuine issue of material fact, further discovery is not warranted. *See Crye Precision LLC v. Duro Textiles, LLC*, 689 F. App'x 104, 108 (2d Cir. 2017) ("[A] court plainly has discretion to reject a request for discovery if the evidence sought would be cumulative or if the request is based only on speculation as to what potentially could be discovered, and a bare assertion that the evidence supporting plaintiff's allegations is in the hands of the moving party is insufficient to justify the denial of summary judgment.") (citation omitted). Plaintiffs' motion for additional discovery is therefore DENIED.

## III. The Undisputed Facts.

SNAP, formerly called the Food Stamp Program, is administered by FNS "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. §

5

2011. The program provides qualifying households with monthly allotments processed through plastic Electronic Benefit Transfer ("EBT") cards which operate in the same manner as a debit card and which allow households to purchase eligible food items[1] at authorized retail stores. Each SNAP transaction requires a SNAP recipient to use a unique pin code, which, in turn, creates a record of the date, time, and amount of each transaction and the identity of the household engaging in the transactions. *See Young Choi Inc. v. United States*, 639 F. Supp. 2d 1169, 1173 (D. Haw. 2009). SNAP regulations prohibit authorized retail stores from exchanging EBT cards for cash, a practice which is defined as trafficking under the SNAP regulations. *See Kahin v. United States*, 101 F. Supp. 2d 1299, 1303 (S.D. Cal. 2000) (observing that SNAP benefits trafficking includes the sale of benefits for cash at food retailers).

FNS maintains a national electronic database which records every EBT transaction through a computerized program called ALERT which is designed to monitor and ensure retail compliance with SNAP regulations. "Because EBT debits are electronically recorded, the records can be scanned by various computer programs for irregularities and abnormalities." *Idias v. United States*, 359 F.3d 695, 696 (4th Cir. 2004). "[T]he FNS relies on the irregular and inexplicable patterns in the EBT data, as well as on the sheer volume of transactions compared to inventory of store goods, to find conclusive evidence of . . . trafficking of food stamps." *Kahin*, 101 F. Supp. 2d at 1303. Based on the results of an ALERT report, FNS may open an administrative case, investigate a store, and take enforcement actions as authorized under the SNAP program. Disqualification may be based on "facts established through on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an [EBT] system." 7 U.S.C. § 2021(a)(2).

Central Market is a grocery store owned by Mr. Timsina and Mr. Adhikari which from July 2015 through December 2015 was located at 35 West Allen Street in

---

[1] SNAP authorizes the purchase of "any food or food product for home consumption except alcoholic beverages, tobacco, [and] hot foods . . . ready for immediate consumption[.]" 7 U.S.C. § 2012(k).

Winooski, Vermont.[2] From March 11, 2013 through its termination from the SNAP program, Central Market participated as a SNAP-authorized retail store.

In 2015, FNS commenced an investigation of Central Market's compliance with SNAP regulations in response to ALERT reports generated for Central Market from July 2015 through December 2015 (the "Review Period"). During the Review Period, the ALERT Reports identified four categories of statistically unusual EBT transaction patterns: (1) rapid sets of purchases of multiple items by different households within a short time period; (2) rapid and repetitive transactions involving the same household; (3) the depletion of the majority of monthly benefits in a short time frame; and (4) a large number of high-dollar transactions. Specifically, the ALERT Reports flagged: forty-one transaction sets in which different SNAP-eligible households made purchases using their SNAP benefits in time frames ranging from twenty-four seconds to four minutes and thirty-eight seconds between transactions with the total amount of these transactions reflecting $5,107.15 in SNAP purchases; eighty-eight transaction sets totaling $7,342.85 wherein the time frame for transactions by the same household ranged from one minute and one second to twenty-three hours and thirty-five minutes; twenty-one transaction sets totaling $3,962.63 wherein individual households depleted all or a majority of their monthly benefits allotment within time frames ranging from forty-four seconds to five minutes and eighteen seconds; and 365 purchases ranging from $59.39 to $411.00 which were considered by FNS to be excessively large in light of Central Market's size and inventory.

In its investigation, FNS compared Central Market's EBT redemptions with grocery stores of a similar size in Vermont and found that the average EBT transaction at Central Market during the Review Period was $24.87, whereas the average EBT transaction at other "combination grocery/other stores" in Vermont was approximately $15.19. (Doc. 48-16 at 12, ¶ 22.) FNS also found that the dollar volume of transactions

---

[2] Plaintiffs note that Central Market is now located at 242 North Winooski Avenue in Burlington, Vermont.

for Central Market during the Review Period was over $110,000, whereas the average dollar volume of transactions for combination grocery/other stores in Vermont was approximately $20,000.

On March 5, 2016, a FNS Field Officer[3] performed an inspection which included a survey of Central Market's facilities and goods for sale, photographs of the entire store, and documentation of checkout counter processes and capabilities. Upon conclusion of the inspection, the Field Officer's report found that Central Market possessed one point-of-sale device; one cash register; one optical scanner; one checkout counter which was approximately two feet by three feet; no adding machine or calculator; no conveyor belts; approximately ten handheld shopping baskets; and no shopping carts. He noted that Central Market's shopping area was approximately 1,500 square feet[4] and that there was no food stored outside of public view. The Field Officer observed that Central Market did not advertise promotional pricing for specials or bulk food offered at a discount, offer deli items, or sell hot food, fresh meat, or fresh seafood.

On March 22, 2016, FNS issued a charge letter to Mr. Timsina and Mr. Adhikari which stated that Central Market was being charged with SNAP trafficking and was being considered for permanent disqualification from the SNAP program (the "Charge Letter"). The Charge Letter reported the results of FNS's investigation and described the activity that led FNS to consider Central Market for permanent disqualification, including four categories of transactions which were identified as "suspicious." The Charge Letter informed Mr. Timsina and Mr. Adhikari that they could "present any information, explanation, or evidence . . . regarding the[] charges" either in writing or by telephone to a FNS program specialist and that FNS could impose a civil money penalty of up to

---

[3] Plaintiffs point out that the inspection was conducted by an individual employed by ISN Corporation, a company contracted by FNS.

[4] Plaintiffs note that the Administrative Record contains inconsistent statements regarding the size of the store ranging from 900 square feet to 3,500 square feet. As they do not offer their own measurement, the court does not deem Defendant's statement that Central Market occupies 1,500 square feet contested.

8

$59,000 in lieu of permanent disqualification if Central Market met certain conditions. (AR 133.)

By letters dated March 30, 2016 and April 15, 2016, Mr. Timsina and Mr. Adhikari responded to the Charge Letter, denying the charges and offering explanations for the SNAP transactions that had been flagged as suspicious. Their response included factual submissions comprised of bank statements; an expense and revenue report; an affidavit and letter from their accountant; and copies of receipts and checks.

In a letter dated May 17, 2016, FNS notified Mr. Timsina and Mr. Adhikari that it had considered their letters and submissions, but had concluded that the violations cited in the Charge Letter had occurred and that Central Market would be permanently disqualified from the SNAP program, effective May 17, 2016. The letter further advised Mr. Timsina and Mr. Adhikari that FNS had considered them for a civil monetary penalty instead of disqualification, but found that they were not eligible because they failed to submit the required evidence.

In a letter dated May 27, 2016, Mr. Timsina and Mr. Adhikari requested review of the Agency decision. On June 2, 2016, FNS Administrative Review Officer ("ARO") Lorie Conneen acknowledged receipt of Plaintiffs' timely request for administrative review and advised Plaintiffs that they were required to set forth reasons for their request. In response, Plaintiffs resubmitted the materials originally provided to FNS in their March and April 2016 letters. In addition, Plaintiffs submitted a letter from Raghu Acharya, President of the Green Mountain Bhutanese Organization, Inc.,[5] affidavits from

---

[5] In this letter, Mr. Acharya's statements include the following: "On the other hand, [members of the Bhutanese community] more often visit[] Asian owned grocery stores to purchase daily use goods, (rice, lentil, spices, green vegetables) and much more. . . . Meantime, they will find out the balances on Food Stamps and *sometimes even cash in their EBT cards.*" (AR 565) (emphasis supplied). Defendant points to the italicized statement as an admission that Central Market allowed customers to exchange EBT benefits for cash. Although Plaintiffs do not dispute that Mr. Acharya made this statement, they deny that Central Market exchanged EBT benefits for cash. Because it appears that Mr. Acharya's statements pertain to Asian-owned grocery stores in general rather than to Central Market in particular, the court does not treat this statement as an admission. *See* Fed. R. Evid. 801(d)(2)(B) (in order to constitute an adoptive admission, a

9

five of Central Market's customers, and receipts showing large purchases of rice as well as other food items.

On June 7, 2017, ARO Conneen issued a Final Agency Decision affirming FNS's decision to permanently disqualify Central Market from the SNAP program, finding that it was "more likely true than not true that program violations did, in fact, occur as charged." (AR 765.) Under applicable law, a permanent disqualification is mandated upon a finding of trafficking. *See* 7 U.S.C. § 2021(b)(3)(B). The Final Agency Decision stated that Central Market was not eligible for a civil money penalty because it did not timely request one or provide evidence to support its eligibility. In her decision, ARO Conneen indicated that she had considered the FNS's investigative records as well as Plaintiffs' submissions.

On July 11, 2017, Plaintiffs timely filed this lawsuit to challenge the permanent disqualification of Central Market from the SNAP program. In their Complaint, they allege that FNS "errantly found that the Plaintiffs had committed trafficking as a result of its use of an algorithm/computer program which arbitrarily determined that the Plaintiffs' EBT transactions were inherently suspicious" and which "failed to take into account the business practices of Central Market, and the pricing structure maintained by the store for SNAP eligible items, and the specialized clientele who shop at the store." (Doc. 1 at 7, ¶¶ 29, 30.) Plaintiffs further assert that Defendant "relied solely on assumptions resulting from the data in its possession, and summarily disregarded the plausible and likely explanations provided by the Plaintiffs." *Id.* at ¶ 31. Plaintiffs therefore request that their permanent disqualification as a SNAP-authorized retailer be vacated.[6]

---

statement by Plaintiffs must be one which "the party manifested that it adopted or believed to be true").

[6] In its motion for summary judgment, Defendant argues that the sanction of permanent disqualification was supported by the law and the facts. However, Plaintiffs do not challenge the sanction imposed; instead they challenge FNS's finding that they trafficked EBT benefits. The court therefore does not address the sanction imposed by FNS.

10

## IV. The Disputed Facts.

Defendant contends that the ALERT program identifies statistically unusual EBT transaction patterns to target possible fraud or trafficking of benefits. Plaintiffs assert that the patterns identified by the ALERT program have no evidentiary correlation to trafficking or fraud, citing the testimony of Douglas Wilson, a Program Analyst and ALERT Program Manager at FNS who was deposed in an unrelated case in October 2016. Plaintiffs point out that, in that deposition, Mr. Wilson stated: "[t]he fact that we look at these analysis and look for these patterns does not indicate that the retailer is committing fraud. This is one factor that the investigator user uses along with other factors to make a determination." (Doc. 19-2 at 51.) While Plaintiffs agree that the ALERT Reports in this case set forth four categories of transaction patterns, they dispute that these transaction patterns were unusual or suspicious for the following reasons.

First, Plaintiffs assert that the "combination grocery/other stores" FNS chose to generate a comparison fall within a "catch-all category that encompasses a wide variety of store[] types and offerings[.]" (Doc. 48-16 at 13.) They contend that FNS compared Central Market to statewide average transactions at stores that did not offer the same inventory, served different ethnic groups, and were outside the geographic area of Central Market. Plaintiffs argue that this practice is in violation of Defendant's Standard Operating Procedures, which instruct FNS agents that "[t]here should be an emphasis on comparable stores that have similar goods catering to the same cultural groups." (Doc. 48-26 at 7.) Plaintiffs contend that only one store of the same type, Kamana Grocery, was selected for comparison, but that Kamana Grocery's data, inventory, and transactions were not included in the Administrative Record although Plaintiffs have apparently received some of that data in discovery. Plaintiffs also assert that they had a local monopoly in South Asian groceries, accounting for Central Market's high volume of sales, and that many of their customers had a propensity to co-shop, meaning that they shopped together and Central Market pre-calculated and divided their purchase, charging them consecutively. Plaintiffs attached receipts indicating several instances in which purchases were split.

11

Second, Plaintiffs dispute that the forty-one sets of transactions in which different households made purchases consecutively took place in "unusually short" time frames because Plaintiffs were able to process credit card transactions in similarly short time periods; specifically that within one minute, Central Market processed one credit card transaction for $21.50 and another for $95.68. On another occasion, Central Market processed a credit card transaction for $9.00 within three minutes of another credit card transaction for $45.77.

Third, Plaintiffs dispute Defendant's conclusion that the eighty-eight transactions identified in the ALERT Reports were made within "unusually short" time periods because the Administrative Record shows that the same households made multiple, consecutive purchases at other stores within similar time periods. For example, Plaintiffs point out that on August 1, 2015, one household made a $194.86 purchase at 5:28 p.m. and five minutes and thirty-one seconds later made a $78.09 purchase. On September 1, 2015, the same household made a $153.39 purchase at 6:23 p.m. and a $13.95 purchase at 6:52 p.m. On September 20, 2015, another household made a $126.40 purchase at 8:33 p.m. and a $43.21 purchase thirty-five minutes and twenty-three seconds later. Plaintiffs note that several of their customers stated in affidavits that they would occasionally visit Central Market more than once a day. Plaintiffs further observe that credit card customers make multiple purchases at Central Market within short time periods. For example, Plaintiffs note that a $151.17 purchase and a $44.61 purchase were made on the same credit card within five minutes of each other; a $42.56 purchase and a $19.54 purchase were made on the same credit card within one minute of each other; and a $32.00 purchase and a $12.98 purchase were made on the same credit card within eight minutes of each other.

Fourth, Plaintiffs disagree with Defendant's determination that there were twenty-one sets of transactions in which a household depleted all or a majority of its monthly benefit allotment in an "unusually short period of time[,]" (Doc. 48-16 at 6), pointing out that several of the households identified exhausted their benefits regularly in short periods of time at other stores, including Kamana Grocery, Costco, and Thai Phat. For

12

example, Plaintiffs point out that one household received its benefits on or about the sixth day of the month and spent 82.7% of its monthly allotment within thirty-six hours over the course of three transactions. Plaintiffs also assert that the Agency's transaction logs have been materially altered because there is no indication as to when each household's benefits were issued and there are instances in which hundreds of dollars disappear from accounts between transactions without explanation. Defendant counters that Plaintiffs fail to explain several specific unusual transactions in this category. For example, on July 7, 2015, a household spent $119.00 at Costco less than an hour before spending $200.35 at Central Market, leaving the household with only $4.11 in SNAP benefits for the remainder of the month of July. On November 20, 2015, a household spent $159.77 at Costco approximately one hour before spending $411.00 at Central Market, leaving the household with only $0.23 in SNAP benefits remaining for that month.

Fifth, Plaintiffs dispute that there were 365 "excessively large" transactions, given the size and inventory of Central Market. *Id.* at 8. Plaintiffs assert that Central Market was "exceptionally well stocked" during the Review Period and that some of the households identified regularly made large purchases at other stores similar to Central Market. *Id.* For example, they note that Household *9478 made purchases at Community Halal Store in the amounts of $174.32, $58.72, $124.76, and $133.61 during the Review Period; Household *2268 made purchases at four other Asian groceries in the amounts of $69.00, $45.97, $92.00, $148.00, and $46.59 during the Review Period; and Household *8600 made purchases from Nepali Dumpling in the amounts of $193.00 and $48.19 during the Review Period. Plaintiffs submitted affidavits from SNAP participants who shopped at Central Market stating that they frequently made large purchases there. Three of these affiants indicated that they regularly bought groceries for everyone in their household and that their households ranged in size from six to twelve individuals. Defendant points out that none of these five affiants admitted that he or she engaged in any of the transactions which were identified as suspicious in the ALERT Reports.

Finally, Plaintiffs note that Central Market sold several items in bulk for relatively high prices and that customers who paid with credit cards spent similar amounts to those

paying with EBT cards. Plaintiffs attached a list of Central Market's inventory which indicates that Central Market sold the following products: "Hawai Plantain" for $45.00; "Yellow Plantain" for $42.00; a five-pound bag of "Farallon[] shrimp" for $31.99; a four-pound bag of "Champmar, white shrimp" for $27.99; a three-pound bag of goat meat for $15.99; a 32.2-ounce bag of goat cubes for $14.99; and a two-kilogram bag of cassava flour for $14.99. (Doc. 48-10 at 2.) Plaintiffs dispute the observation that Central Market did not sell items in bulk, asserting that there are bulk products visible on the store shelves in the photos taken by the FNS Field Officer. Plaintiffs also note that the customers who submitted affidavits on Plaintiffs' behalf indicated that they often purchased items in bulk from Central Market, including boxes of fruit, which Central Market employees would transport to their homes. They dispute the FNS Field Officer's conclusion that the most expensive items available in the store were frozen fish and rice, noting that the most expensive items listed in their store inventory are plantains and shrimp.

## V. Conclusions of Law and Analysis.

### A. Judicial Review of a Final Agency Determination.

A store owner aggrieved by a final Agency determination "may obtain judicial review thereof by filing a complaint against the United States in the United States court for the district in which it resides or is engaged in business . . . requesting the court to set aside such determination." 7 U.S.C. § 2023(a)(13). Judicial review of permanent disqualification from the SNAP program is "a trial *de novo* . . . in which the court shall determine the validity of the questioned administrative action in issue[.]" *Id.* at § 2023(a)(15); *see also Ibrahim v. United States*, 834 F.2d 52, 53 (2d Cir. 1987) ("[T]he Food Stamp Act requires the district court to reexamine the [A]gency's decision on a fresh record, rather than determining whether the administrative decision was supported by substantial evidence. . . . [S]uch review afford[s] appellant due process."). Although the statute:

provides no further guidance regarding how the trial should proceed or which party bears the burden of proof[,] . . . in a trial de novo under § 2023,

14

other circuits have held consistently that, given the nature of the statutory scheme, a store owner who seeks to set aside an agency action bears the burden of proof.

*Fells v. United States*, 627 F.3d 1250, 1253 (7th Cir. 2010) (collecting cases holding store owner bears burden of proof). "Because permanent disqualification is authorized for a singular instance of trafficking, a plaintiff's burden encompasses each cited instance of trafficking." *SS Grocery, Inc. v. U.S. Dep't of Agric., Food & Nutrition Serv.*, 340 F. Supp. 3d 172, 180 (E.D.N.Y. 2018) (citation and internal quotation marks omitted).[7] In other words, Plaintiffs must establish that it is more likely than not that FNS's final decision is invalid. *See SS Grocery, Inc.*, 340 F. Supp. 3d at 180 ("Plaintiffs, as the parties challenging their permanent disqualification from SNAP, bear the burden of proving by a preponderance of the evidence that the agency's action was 'invalid.'") (citation omitted).

In a *de novo* review, the district court "must reach its own factual and legal conclusions based on the preponderance of the evidence, and should not limit its consideration to matters previously appraised in the administrative proceedings." *Ibrahim*, 834 F.2d at 53–54 (citation omitted). "Summary judgment has been held to be appropriate on de novo judicial review of a disqualification of a retail food store from participating in the SNAP Program if no genuine issue of material fact exists." *Nadia Int'l Mkt. v. United States*, 2015 WL 7854290, at *5 (D. Vt. Dec. 2, 2015), *aff'd*, 689 F. App'x 30 (2d Cir. 2017) (citation and alterations omitted). At the summary judgment stage, "[a]lthough the nonmoving party does not need to demonstrate by a preponderance of the evidence that the violations in question did not occur, it must produce at least some 'significant probative evidence tending to support the complaint[.]'" *Young Choi Inc.*, 639 F. Supp. 2d at 1178 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.

---

[7] Under applicable law, the definition of trafficking includes "buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone[.]" 7 C.F.R. § 271.2.

15

253, 290 (1968)); *see also Kahin*, 101 F. Supp. 2d at 1303 ("In order to preclude summary judgment, Plaintiff must raise material issues of fact as to each of the violations charged against the [store].").

## B. Summary Judgment Standard of Review.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson*, 477 U.S. at 248). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Moreover, not all disputes of fact are material – "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

16

## C.  Whether Defendant May Rely on ALERT Reports and an In-Store Inspection.

Defendant asserts that it is entitled to judgment as a matter of law because Plaintiffs fail to establish by a preponderance of the evidence that Central Market did not engage in trafficking of EBT benefits.  Plaintiffs counter that the ALERT program does not accurately detect trafficking activity and therefore the Agency should not be allowed to rely upon the ALERT Reports.  Plaintiffs further challenge the following practices and procedures employed by the Agency in investigating Central Market, including: (1) inconsistencies in its calculation of the size of Central Market; (2) reliance upon an unidentified individual's statement that Central Market was trafficking EBT benefits; (3) a misunderstanding of the term "FS Grocery" in Central Market receipts, which Plaintiffs allege refers to "food stamp eligible grocery item[,]" (Doc. 19 at 16); (4) the exclusion of an invoice review from the Administrative Record; (5) reliance upon the personal experience of an FNS program specialist in determining whether items listed on an invoice were products that would typically be sold at a grocery store; (6) disregard of language and cultural issues impacting Central Market's customers; (7) allowing insufficient time for Plaintiffs to produce invoices demonstrating their food purchases; and (8) comparing Central Market to "combination grocery/other stores" which are not similar to Central Market.

The governing statute and regulation permit the Agency to base its final determination of SNAP program violations on analysis of EBT transactions reports, redemption data analysis, and a field officer's report.  *See* 7 U.S.C. § 2021(a)(2) (allowing FNS to disqualify an authorized retail store based on "on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer system"); 7 C.F.R. § 278.6(a) (same).  Courts have recognized that the Agency may rely on these forms of evidence as well.  *See, e.g.*, *Nadia Int'l Mkt.*, 2015 WL 7854290, at *5-7 (finding that plaintiff had engaged in trafficking of SNAP benefits based upon suspicious transactions identified in ALERT reports and an FNS field officer's report); *Young Choi Inc.*, 639 F. Supp. 2d at 1179 ("The law is clear that

FNS may base its finding of a violation on analysis of EBT transaction reports or on-site store surveys").[8] "The Agency thus need not catch a store 'red-handed' to support its determination of trafficking." *Nadia Int'l Mkt.*, 2015 WL 7854290, at \*5. Plaintiffs' challenges to the ALERT Reports and store inspections as tools to detect EBT trafficking are therefore insufficient to create a genuine issue of material fact.

Because the court conducts a *de novo* review of the Agency's decision, it is not limited to "matters previously appraised in the administrative proceedings[,]" *Ibrahim*, 834 F.2d at 53–54 (citation omitted), and thus to the extent the issues Plaintiffs raise bear upon FNS's conclusions with regard to the four categories of suspicious transactions identified in the ALERT reports, they are considered even if Plaintiffs failed to address them previously in the administrative review.

Here, Plaintiffs seek to offer plausible alternative explanations for the four categories of transaction patterns that were identified as suspicious. The court thus considers each of the challenged categories of evidence and determines whether Plaintiffs have established by a preponderance of the evidence that a genuine issue of material fact exists with regard to the charged violation. *See Duchimaza v. United States*, 211 F. Supp. 3d 421, 432 (D. Conn. 2016) ("[T]o defeat summary judgment, [p]laintiffs must submit evidence from which a reasonable juror could conclude that the agency's determination is 'invalid' with respect to each cited instance of trafficking.").

---

[8] *See also Kahin*, 101 F. Supp. 2d at 1303 (granting summary judgment in the Agency's favor where FNS "relie[d] on the irregular and inexplicable patterns in the EBT data, as well as on the sheer volume of transactions compared to inventory of store goods, to find conclusive evidence of [the store's] trafficking of food stamps"); *Rockland Convenience Store v. United States*, 2011 WL 5120410, at \*8 (D. N.H. Oct. 27, 2011) ("It is indisputable . . . that a 'court may grant the government's motion for summary judgment based on evidence from transactions reports[]'") (quoting *Young Choi Inc.*, 639 F. Supp. 2d at 1178); *Maredia v. United States*, 2016 WL 7736585, at \*4 (S.D. Tex. Aug. 16, 2016) (holding that the plaintiff's argument that "the use of a computer is improper to disqualify [a retailer] from participating in SNAP is . . . legally wrong").

18

## D. Whether Defendant is Entitled to Judgment as a Matter of Law.

### 1. Category 1: Multiple Transactions from Different Accounts Within Short Time Frames.

The ALERT Reports document forty-one sets of back-to-back transactions that were completed in time frames ranging from twenty-four seconds to four minutes and thirty-eight seconds and resulting in SNAP purchases of $5,107.15. Defendant argues that "[i]n addition to the high dollar values of many of these sales, the timing of these transactions makes it implausible that they were all legitimate transactions." (Doc. 10 at 18.) It points out that because of the relatively small size of Central Market, the presence of only one cash register, one checkout counter, one optical scanner, limited checkout counter space, no conveyor belts, and a limited stock of high value SNAP-eligible items, a store clerk could not physically process the number of items necessary and undertake the multiple steps of a SNAP redemption to achieve the total dollar amount of these purchases in the time periods recorded and therefore this transaction pattern supported a finding that Central Market was trafficking in EBT benefits. For example, transactions 5 and 6 required the cashier to process $292.90 worth of eligible food items in two minutes and forty-eight seconds. Transactions 11 and 12 required the cashier to process $190.00 worth of eligible food items in three minutes and thirty-three seconds. Transactions 19 and 20 required the cashier to process $397.40 worth of eligible food items in three minutes and one second. Transactions 51 and 52 required the cashier to process $278.06 worth of eligible food items in one minute and forty-four seconds. One transaction for $44.72 was completed in twenty-seven seconds.

Plaintiffs offer several explanations for this data, noting that Central Market had only one local competitor that offered South Asian groceries and thus attracted a high volume of customers. They further assert that Central Market's inventory included expensive goods[9] and that the sale of these high-value items and the clerks' use of both

---

[9] Plaintiffs' examples include boxes of plantains which were sold for $42.00 or $45.00, a five-pound bag of Farallon shrimp which was sold for $31.99, a four-pound bag of white shrimp

19

optical scanners and manual entry to process items at the register rendered it possible for a customer to purchase a significant amount of food in a short time period. Plaintiffs produced receipts for several, but not all, of the transaction sets identified by Defendant which indicate that a total was calculated and then split between two EBT cards. Plaintiffs further rely on evidence that Central Market made sales of similar value in short time periods to customers paying with a credit card.[10] Plaintiffs argue that this evidence demonstrates Central Market's capacity to process several transactions within short time periods.

Defendant counters that regardless of Plaintiffs' capacity with regard to quick processing of sales, they have not rebutted the specific transactions in question. The court agrees. In light of the undisputed facts regarding Plaintiffs' operations, there is no plausible way that Plaintiffs could process transactions 5, 6, 11, 12, 51, and 52 in the time frames allotted. Plaintiffs proffer no evidence to the contrary such as a demonstration that those results are achievable without EBT trafficking and without alterations in Central Market's operations or inventory. As a result, although Plaintiffs' evidence may be sufficient to create a genuine issue of material fact as to certain transactions, it is not sufficient to create one with regard to the remainder. The court thus finds that Plaintiffs have failed to raise a genuine issue of material fact with regard to each transaction in this category.

## 2. Category 2: Multiple Transactions from the Same Account Within Short Time Frames.

FNS identified eighty-eight transactions reflecting multiple purchases from the same individual account in unusually short time frames ranging from one minute and one second to twenty-three hours and thirty-five minutes and totaling $7,342.88. The average transaction among these eighty-eight transactions totaled $83.44, which was

---

which was sold for $27.99, a three-pound bag of goat meat which was sold for $15.99, and a two-kilogram bag of cassava flour which was sold for $14.99.

[10] Plaintiffs note that within a one-minute period Central Market processed one credit card transaction for $21.50 and another for $95.68, and within a three-minute period Central Market processed a credit card transaction for $9.00 and another credit card transaction for $45.77.

approximately 5.5 times larger than the average transaction made at other combination grocery/other stores in Vermont during the Review Period. FNS concluded that this pattern was evidence of a strategy used to avoid detection of single, higher-dollar transactions.

Plaintiffs proffer evidence that a substantial portion of the store's customers are refugees from Nepal, Myanmar, and Somalia; that these households were larger than the average SNAP household; and that these populations tended to shop in groups as a social activity. Plaintiffs submitted affidavits from five Central Market customers, several of whom noted that they sometimes made purchases from Central Market more than once a day. Plaintiffs point to records demonstrating that many of its credit card customers also made successive purchases within a short time frame. For example, Plaintiffs note that a $151.17 purchase and a $44.61 purchase were made on the same credit card within five minutes of each other; a $42.56 purchase and a $19.54 purchase were made on the same credit card within one minute of each other; two separate purchases for $17.62 were made on a credit card within one minute; a $34.00 purchase and a $6.99 purchase were made on a credit card within one minute; a $32.00 purchase and a $12.98 purchase were made on a credit card within eight minutes; a $14.82 purchase and a $15.26 purchase were made on a credit card within three minutes; a $68.83 purchase, a $6.96 purchase, and a $20.00 purchase were made on a credit card within five hours; a $27.67 purchase and a $32.00 purchase were made on a credit card within three minutes; and a $62.54 purchase and a $15.00 purchase were made on a credit card within approximately one hour. Plaintiffs argue that this evidence supports their contention that "these 'fast in time' transactions occur in the normal course of business at the store, and are not the result of trafficking, but rather the store's popularity and inventory[.]" (Doc. 48 at 12.)

Plaintiffs' general explanations regarding the shopping preferences of Central Market customers are insufficient to raise a genuine dispute of material fact with regard to each transaction in this category. *See Duchimaza*, 211 F. Supp. 3d at 435 (finding that plaintiffs' generalized assertion that their customer base included large families that lived close to the store in question was insufficient to explain transactions demonstrating

multiple, successive withdrawals from the same account where plaintiffs "[did] not even attempt to account for the specific transactions the FNS identified in this category"). Moreover, although Plaintiffs point to a series of purchases made using the same credit card in close temporal proximity, Plaintiffs do not claim this evidence specifically addresses the eighty-eight charged transactions at issue in this category. Accordingly, they have failed to create a genuine issue of disputed fact with regard to each charged transaction.

### 3. Category 3: Depletion of the Majority of Monthly Benefits in One or a Few Transactions.

FNS identified twenty-one instances during the Review Period in which a household exhausted the majority of its monthly benefits in one or a few transactions. Many of these households depleted their allotments in a single transaction, while other depletions occurred in two transactions ranging from forty-four seconds apart to five minutes and eighteen seconds apart. The households' remaining allotments ranged from $0.00 to $11.80. As Defendant points out, "[d]epleting the benefit early in the month, leaving little or no benefits for the rest of the month or spending the majority of their monthly benefit in only a few transactions in a single day is inconsistent with normal shopping behaviors of SNAP benefit households and is indicative of trafficking." (Doc. 10 at 22-23.) Several of these transactions took place shortly after a household had made smaller purchases at larger, better-stocked stores. For example, on July 7, 2015, a household spent $119.00 at Costco less than an hour before spending $200.35 at Central Market, leaving the household with only $4.11 in SNAP benefits remaining for the month of July. On November 20, 2015, a household spent $159.77 at Costco approximately one hour before spending $411.00 at Central Market, leaving the household with only $0.23 in SNAP benefits remaining for that month. FNS found this pattern indicative of trafficking because it was inconsistent with normal shopping behaviors of SNAP households.

Although Plaintiffs agree that these transactions took place, they argue they are not indicative of EBT trafficking because many households spend most of their benefits

22

soon after receiving them, splitting their benefits between several different stores. They further contend that Central Market had an extensive inventory, making it likely that customers might choose to spend large portions of their monthly EBT benefits there. This type of "generalized, hypothetical explanation[]" for suspicious transactions "fall[s] far short of the specificity required to defeat summary judgment." *AJS Petroleum, Inc.*, 2012 WL 683538, at \*6; *see also Nadia Int'l Mkt.*, 2015 WL 7854290, at \*7 (holding that general justifications for suspicious transactions were insufficient to rebut Agency finding of EBT trafficking); *Rodriguez Grocery & Deli*, 2011 WL 1838290, at \*3 ("Trafficking may be shown by irregular patterns in a store's EBT data, even if some irregularities can be explained by legitimate customer behaviors.").

Because Plaintiffs fail to identify a genuine issue of material fact with regard to the transactions in this category, the Agency's determination must stand. *See Young Choi Inc.*, 639 F. Supp. 2d at 1185 (finding that summary judgment in the government's favor was warranted where plaintiff "fail[ed] to raise a material issue of fact regarding the . . . transactions that depleted the majority of a recipient's monthly food stamp benefit"); *Kahin*, 101 F. Supp. 2d at 1300 (recounting FNS evidence of trafficking, including "a high number of balance depletion transactions" by one household and concluding that it supported summary judgment in FNS's favor).

## 4. Category 4: High-Dollar-Value Transactions.

In the fourth and final category identified in the ALERT Reports, FNS found that Central Market customers conducted 365 high-dollar-value transactions during the Review Period totaling $38,948.85. These transactions ranged from $59.39 to $411.00. Defendant notes that the average purchase among these 365 "excessively large" transactions was $106.71, but that the average SNAP transaction at other combination grocery/other stores in Vermont during the Review Period was $15.19. FNS concluded that transactions of this size were atypical in light of Central Market's size, inventory, and pricing. Defendant claims that Plaintiffs failed to provide documentation establishing sufficient inventory to support the "extremely high level of EBT redemptions" during the Review Period. (Doc. 56 at 5, n.4.)

Plaintiffs argue that because most households that shop at Central Market are larger than the average SNAP household, purchases at Central Market were larger than at comparable stores. As an example, Plaintiffs cite the declaration of Amina Ali, who stated that she bought groceries from Central Market for eleven individuals who lived in her household and usually spent over $100. Plaintiffs note that stores such as CVS, Walgreens, and Dollar Tree were used as comparison stores in calculating the average SNAP transaction and assert that these stores' inventories, customers, and business models differ substantially from that of Central Market. Plaintiffs further argue that other South Asian groceries would have made a more accurate comparison group, observing that several households also made large purchases from other South Asian groceries during the Review Period. Defendant counters that there are at least four SNAP-authorized stores located in the area of Central Market, but that "these other ethnic/specialty stores frequented by Central Market's customers do not display the suspicious EBT transactions displayed at Central Market." (Doc. 23 at 13.)

Although Central Market's inventory reveals ten products that were priced between $20.00 and $45.00, this does not explain why customers frequently made purchases worth hundreds of dollars during the Review Period.[11] Plaintiffs' identification of several households that made large purchases from other grocery stores and submission of five affidavits from customers with large households do not adequately rebut the 365 excessively large transactions documented during the Review Period. *See Nadia Int'l Mkt.*, 2015 WL 7854290, at \*7 (finding that ALERT reports documenting fifty-two transactions that "appear[ed] excessive in light of Plaintiff's size, inventory, and pricing" were indicative of trafficking and granting summary judgment in FNS's favor).

---

[11] For example, Plaintiffs do not offer a particularized explanation for a household spending $411.00 of their EBT benefits in a single transaction at Central Market only an hour after spending $159.77 at Costco even though Plaintiffs knew the identity of the household in question and could presumably obtain an explanation.

24

### 5. Whether Summary Judgment is Warranted.

Although Plaintiffs may have established a genuine dispute of material fact as to *some* allegedly suspicious transactions identified in the ALERT Reports, they fail to establish a genuine dispute of fact as to *each* charged transaction in each category. "Since permanent disqualification is warranted on 'the first occasion' of coupon trafficking, it is Plaintiff[s'] burden to raise material issues of fact as to each of the transactions set forth as suspicious by the FNS." *Kahin*, 101 F. Supp. 2d at 1303. Even when examined in the light most favorable to Plaintiffs, a preponderance of the evidence thus establishes that Central Market was engaged in trafficking of EBT benefits. Summary judgment in Defendant's favor is therefore mandated. *See* Fed. R. Civ. P. 56(a); *Kahin*, 101 F. Supp. 2d at 1303 (holding that "[w]hile the [c]ourt agrees that Plaintiff's explanations about the spending patterns of his Somali customers may tend to negate some of the inferences from the EBT data and raise some material issues of fact, they do not sufficiently account for all the suspicious activity" and granting summary judgment in the government's favor); *Duchimaza*, 211 F. Supp. 3d at 434 (finding that where plaintiffs proffered evidence "to support a plausible alternative explanation" for one transaction set, but failed to do so with regard to two other transaction sets, summary judgment in the government's favor was warranted).

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiffs' request for additional discovery. The court GRANTS IN PART and DENIES IN PART Defendant's motion to strike. (Doc. 57.) The court GRANTS Defendant's motion for summary judgment. (Doc. 10.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this $\underline{19^{th}}$ day of July, 2019.

Christina Reiss, District Judge
United States District Court